**2026 WI 14**

# Supreme Court of Wisconsin



IN THE MATTER OF DISCIPLINARY PROCEEDINGS AGAINST
MICHAEL SEUNG-HYOCK YANG, ATTORNEY AT LAW

OFFICE OF LAWYER REGULATION,
*Complainant-Appellant-Cross-Respondent,*

*v.*

MICHAEL SEUNG-HYOCK YANG,
*Respondent-Respondent-Cross-Appellant.*

No. 2024AP170-D

Decided May 1, 2026

ATTORNEY DISCIPLINARY PROCEEDING

¶1      PER CURIAM.   This case is before the court on briefs involving the Office of Lawyer Regulation's (OLR) appeal and Attorney Michael Seung-Hyock Yang's cross appeal,[1] from a report of Referee Edward E. Leineweber, recommending that Attorney Yang's license to practice law be suspended for one year and that the court impose certain conditions for reinstatement.[2] The underlying complaint alleges four counts of misconduct committed by Attorney Yang involving his representation of two clients (Client 1 and Client 2) in criminal matters, following his appointment as counsel by the State Public Defender's Office (SPD). The

---

[1] *See* SCR 22.17 ("Review; appeal").

[2] *See* SCR 21.16(1m)(f) (conditions on seeking license reinstatement).

OLR alleged that as to each client, Attorney Yang violated Supreme Court Rule (SCR) 20:8.4(i) (sexual harassment)[3] and SCR 20:8.4(g) read together with SCR 40.15 (offensive personality).[4] Briefly summarized, these violations generally involve allegations that Attorney Yang had (or attempted to have) inappropriate physical contact with Client 1, engaged in a pattern of overt or implied sexually suggestive statements and innuendos to Client 1 and Client 2, made sexual advances to both clients, sent explicit sexual messages to Client 2 (including a graphic sexual fantasy), and sent pictures of his genitals to Client 2. As summarized by the referee, the complaint alleged "that the respondent engaged in a course of conduct with respect to each client intended to result in sexual activities with them during the course of representation." Both clients testified that Attorney Yang's comments and conduct were unwanted and they believed he was attempting to have a sexual relationship with them. Attorney Yang admitted to the alleged violations and overall course of conduct, but disputed some of the specific underlying factual allegations.

¶2　　The OLR seeks revocation of Attorney Yang's license to practice law in Wisconsin. Attorney Yang contests at least one factual finding by the referee,[5] contends that the appropriate sanction is a five-

---

[3] SCR 20:8.4(i) states that it constitutes professional misconduct for a lawyer to "harass a person on the basis of sex . . . in connection with the lawyer's professional activities."

[4] SCR 20:8.4(g) states that it constitutes professional misconduct for a lawyer to "violate the attorney's oath." SCR 40:15, the attorney's oath, includes the following promise all attorneys licensed in this state must make: "I will abstain from all offensive personality and advance no fact prejudicial to the honor or reputation of a party or witness, unless required by the justice of the cause with which I am charged."

[5] We note that the referee's report does not contain separately delineated findings of fact. Instead, the referee "incorporated by reference" the "large body of incriminating evidence" that the referee indicated was "painstakingly summarized in the OLR's Post-Hearing Brief[.]" Thus, when we reference the referee's "findings of fact," we refer to those facts set forth on pages 3-17 of the OLR's post-hearing brief, which the referee incorporated by reference into his report. That said, it would have been preferable had the referee expressly set forth

month, 28-day suspension, and further argues that he should be responsible for only one-half of the costs of this proceeding based on what he claims is "over-litigation" by the OLR.

¶3    We conclude that none of the referee's findings of fact are clearly erroneous. Based on those facts, many of which were the result of admissions by Attorney Yang, we conclude that the OLR established all four alleged violations of the Rules of Professional Conduct by clear, satisfactory, and convincing evidence. We further conclude that based on the seriousness and nature of the misconduct, the need to protect the public, the need to impress upon Attorney Yang the seriousness of the misconduct, the need to deter other attorneys from similar misconduct, and the relevant aggravating and mitigating factors, the appropriate sanction in this case is revocation of Attorney Yang's license to practice law. Because we order that Attorney Yang's license to practice law be revoked, we do not address the conditions the referee recommended for the proposed suspension. Finally, consistent with this court's general practice, we impose the full costs of this proceeding on Attorney Yang and reject his argument that the OLR "over-litigated" this case.

## Background[6]

¶4    Attorney Yang was admitted to the practice of law in Wisconsin in 2013. At the time the complaint was filed, his law office, MY Law Office LLC, was located in Middleton, Wisconsin.[7]

---

the aforementioned facts in the body of his report, rather than incorporating the OLR's proposed findings wholesale.

[6] We first set forth the referee's findings of fact, supplemented by additional testimony at the disciplinary hearing and the contents of certain exhibits. We then discuss those facts that Attorney Yang contends are clearly erroneous in the Analysis section, *infra*.

[7] These facts were not contained the with referee's findings of fact but were admitted by Attorney Yang in his answer to the OLR's complaint.

Client 1

¶5    Between August 1, 2022, and October 25, 2022, the SPD appointed Attorney Yang to represent Client 1 in several criminal matters, including a probation revocation proceeding. Attorney Yang did not know Client 1 prior to his appointment to represent her.

¶6    The OLR alleged that "[b]y engaging in [a] course of conduct that included flirtatious and sexually suggestive communications with his client, discussing future sexual activity, and suggesting that she send him writings of an inappropriately personal or sexual nature," Attorney Yang violated SCR 20:8.4(i). The OLR also alleged that by engaging in the same conduct, Attorney Yang violated SCR 20:8.4(g) and SCR 40:15. Attorney Yang admitted both rule violations but denied "engaging in some of the specific conduct alleged[.]" The factual basis for the above counts of misconduct follows.

¶7    Starting at the onset of representation, and continuing during the course of his representation of Client 1, Attorney Yang had inappropriate interactions with her that included flirtation and sexual innuendo. For example, Attorney Yang referred to Client 1 by nicknames such as "sweetie pie." Yang also had or attempted inappropriate physical contact with Client 1, such as hugs and backrubs. This behavior made Client 1 uncomfortable.[8]

¶8    During a court hearing on October 19, 2022, Attorney Yang told Client 1 "[t]hat he was having dirty thoughts, and that [Client 1] wouldn't be able to handle him in bed." Attorney Yang gave his business card to Client 1, which contained his picture. During a telephone call with Client 1 on October 19, 2022, Attorney Yang told her that she "was one crazy girl" and stated that "maybe he could not handle her." Attorney Yang asked Client 1 if she had his "beautiful picture" and suggested that he could keep her company in jail, referring to the picture on his business card. Yang's behavior made Client 1 so uncomfortable she asked a Columbia County Sheriff's Deputy bringing her to court for another hearing to watch Attorney Yang's interactions with her in court because she was afraid that

---

[8] Attorney Yang contends that any such finding by the referee was clearly erroneous. We address this argument below.

Attorney Yang might try and touch her again or make additional sexual comments.

¶9      Attorney Yang had a phone call with Client 1 on January 12, 2023, while she was incarcerated at the Columbia County Jail. Client 1 told Attorney Yang that she was upset because her cousin, a close relative, had recently shot himself in the head.[9] Client 1 told Attorney Yang that she wanted him to get her out of jail as quickly as possible; Attorney Yang responded, "what do I get?" Client 1 interpreted this remark as a request for sexual favors in exchange for representing her.

¶10      Attorney Yang made several other inappropriate remarks during this phone call and asked questions with sexual inuendo. This included making comments about Client 1 liking him, thinking he was "cute," or being sexually/romantically interested in him. Attorney Yang suggested that Client 1 write him "love letters" describing sexual conduct between the two and "certain reactions" she experienced when she looked at his picture or thought about him. Attorney Yang suggested that Client 1 could "secretly whisper" such things in his ear when they were in court. When discussing the possibility of Attorney Yang visiting Client 1 while she was incarcerated, he brought up the topic of conjugal visits. When Client 1 told Attorney Yang that she had just gotten out of segregation, he stated, "you'll have to tell me what you do in the hole by yourself with that picture." Attorney Yang also encouraged Client 1 to write to him to express things that might be "running through your imagination" that she would not want other people to know about because she "might turn red and blush." Attorney Yang also encouraged Client 1 to write about "certain reactions on your body."[10]

---

[9] A recording of this phone call was played during the disciplinary hearing (Ex. 6) and a transcript of the call was admitted into evidence (Ex. 6A).

[10] While not part of the OLR's proposed findings of facts in its post-hearing brief, we also note that the transcript of this phone call included Attorney Yang telling Client 1 that if he visited her in prison "all the girls will want me" and "[y]ou have to fight them off," and asking if she could "deal with that[.]" He then asked Client 1 if he was "worth fighting for," stated that he was "kind of addictive that way," indicated that "I am not a controlled substance and am not illegal to possess," and told her that the "love letters" he requested would "remind[ ] me

¶11    Client 1 testified that she interpreted these comments and questions as asking if she was sexually aroused or "horny" when thinking about him and asking if she touched herself while looking at his picture in segregation. She further testified that she believed that Attorney Yang was attempting to engage in sexual contact with her or suggesting she should engage in sexual contact with him. Client 1 testified that she was not trying to discuss these topics with Attorney Yang, that they made her feel uncomfortable, and that she was not interested in conjugal visits with Attorney Yang. Client 1 further indicated that Attorney Yang's behavior during this phone call raised her anxiety rather than helping the mental health crisis she was experiencing.

¶12    During his testimony, Attorney Yang admitted that the above comments during the phone call involved sexual inuendo and that his questions "may have included" requests relating to Client 1's sexual arousal. Likewise, he admitted that his requests for Client 1 to write to him "could have been sexual in nature." Attorney Yang further admitted that he "would understand [Client 1's] basis" for thinking that he was requesting "a sexual response" when he asked about what she did with his picture while in segregation.

¶13    Attorney Yang tried to justify his comments as being "in the context of trying to cheer his client up after she reported she was depressed and sad . . . ." Attorney Yang admitted that during this phone call he was "very concerned" about Client 1's mental health, but did not refer her to any mental health resources. Attorney Yang further testified that he believed the above comments would be helpful to Client 1 in addition to being for his own "titillation": "I think it was mutual. Not only would she be happy that I was flirting with her, but that would also make me happy because I was flirting with her and she was accepting it, which would give me some satisfaction[.]" Ultimately, Attorney Yang conceded that at the time he made the above comments and sexual innuendos, he "thought I broke the rule at that time" and that they were not "appropriate."

¶14    Despite the fact that Attorney Yang's interactions with Client 1 made her uncomfortable, she did not complain to him or report his

how much I miss you." He further indicated at the end of their conversation that "[a]ll these things will be good for you, if you know what I am saying."

conduct to the SPD because she was fearful that he might "retaliate" against her or "screw up" her case. She was also concerned that if she reacted the wrong way, she might make Attorney Yang's conduct worse.

¶15 While Client 1 wanted the opportunity to prove her innocence, she decided to stipulate to the revocation of her probation so she "didn't have to have any more interactions with" Attorney Yang. Client 1 ended up serving a year and half in prison because, in her words, "I would rather just sit in prison than have to see [Attorney Yang] again or have another conversation with him." Client 1 testified that although she did not want to stipulate to the revocation of her probation, she "didn't feel like [she] had a choice" because of Attorney Yang's conduct and the uncertainty of working with another attorney.

¶16 Attorney Yang ultimately withdrew from representation of Client 1, and the SPD appointed successor counsel.

Client 2

¶17 On March 16, 2022, the SPD appointed Attorney Yang to represent Client 2 regarding various criminal matters. Attorney Yang did not know Client 2 prior to his appointment and was Client 2's third attorney on her case.

¶18 The OLR alleged that "[b]y engaging in [a] course of conduct that included flirtatious and sexually explicit communications with his client and sending pictures of his penis to his client," Attorney Yang violated SCR 20:8.4(i). By engaging in the same course of conduct, the OLR alleged that Attorney Yang violated SCR 20:8.4(g) and SCR 40:15. Attorney Yang admitted both rule violations but denied "engaging in some of the specific conduct alleged." The factual basis for these counts of misconduct follows.

¶19 During their initial telephone call, Attorney Yang asked Client 2 about her social media, and Client 2 informed Attorney Yang that she had some videos posted on adult websites. The conversation became "instantly sexual" and focused on adult websites rather than Client 2's

criminal defense.[11] Thereafter, Yang began to engage in inappropriate, sexually explicit communications with Client 2. The discussion made Client 2 uncomfortable and question her legal rights.[12]

¶20     Client 2 told Attorney Yang that she had some discovery materials from her prior attorney and that she could make copies of this material and drop them off at Attorney Yang's office in Madison. In response, Attorney Yang indicated that when Client 2 got to his office, she "could sit on his lap," and "suggested . . . a lot of sexual things," including having physical contact and sexual relations. Client 2 became uncomfortable as a result of these overtures, which were not welcome.[13]

¶21     During their initial telephone call, Attorney Yang asked Client 2 if she would be willing "to separate business from pleasure" and use the Snapchat platform to engage in personal communications with him. Client 2 agreed to do so because she had been told to "play nice" with her lawyers and feared not having legal representation and going to prison if she did not cooperate.

¶22     Attorney Yang used the Snapchat account name "madisonlawyerl" to message with Client 2. Client 2 sent a Snapchat message to Attorney Yang, to which he responded, "hey there porn star." Thereafter, Attorney Yang sent multiple inappropriate, sexually explicit communications to Client 2, including the following: describing specific sexual activities with Client 2, including sexual intercourse and Attorney Yang and Client 2 touching each other's genitals; asking Client 2 if she was the "sapiosexual" that he wanted; asking if Client 2 liked thinking about and imagining him touching her; asking if Client 2 saw "the chemistry we

---

[11] Client 2 further testified that Attorney Yang stated that he was "familiar with that kind of website" and "could help me out as far as putting content online."

[12] Client 2 made the point at the hearing that the tenor of the conversation was such that she questioned "is this my lawyer talking to me, or this this just some guy I met at the bar?"

[13] Client 2 testified: "How did it go from representing me on a criminal matter to now let's fondle each other in my office?"

have" and "feel what we have"; telling Client 2 that he could "give you goosebumps and shivers that will make you just want to sit in my lap even more"; and asking Client 2 if she "got wet" while reading his writing.

¶23 Attorney Yang admitted sending "inappropriate sexually oriented communications" and "one or more" pictures of his penis to Client 2, but indicated his belief that these were sent "at Client 2's request." Client 2 testified that she did not request a picture of Attorney Yang's penis.[14]

¶24 Additionally, Attorney Yang sent Client 2 a long and sexually explicit message via Snapchat, describing "[i]n graphic detail" from a first-person perspective what the author was doing to the reader. Client 2 testified that she believed that this message was Attorney Yang's description of the sexual activities he wanted to engage in with her based on its use of first-person pronouns ("I") to describe the actions and second-person pronouns ("you" and "your") to describe the person being acted upon.[15]

¶25 Client 2 testified that Attorney Yang's messages to her were "gross" and that she experienced "fear and disgust, like utter fear" when reading them. She testified that her "stomach sunk" and she was "in shock" when she received the picture of Attorney Yang's penis and remarked: "Like, this is my lawyer. Why are you—why does anybody send a picture of their penis, and then you have my lawyer who is a state-appointed attorney trying to represent me in a criminal matter sending me a picture of your penis." Client 2 was "disgusted" and testified that these communications were "unwelcome"; however, she did not confront Attorney Yang at first and continued to communicate with Attorney Yang because she was afraid that she would get in trouble or that her legal cases would be compromised.

---

[14] Client 2 testified "absolutely not" when asked if she requested a picture of Attorney Yang's penis.

[15] This message was admitted into evidence as hearing Exhibit 2, contains the preamble "Just thinking about if we were alone," and is pornographic in nature. Client 2 described the message as "basically like the most vulgar smut novel that you could even think of, like something that someone shouldn't even be writing." The message ends with Attorney Yang saying, "This is what I want."

¶26    A day or two after Attorney Yang sent the long and explicit message to Client 2, he asked to come to the motel room where she was temporarily residing to pick up the discovery materials that Client 2 had previously mentioned. Client 2 was concerned that Attorney Yang wanted to come to her motel room to engage in sexual activity with her and "act out" the long message that he had sent just days before. Client 2 sent Attorney Yang a message indicating that she was uncomfortable with him visiting her motel room and suggested that they meet in a public place. Client 2 testified that Attorney Yang "wouldn't take no for an answer" and that she eventually agreed to allow Yang to come to her motel room. Because she was afraid, Client 2 asked some neighboring tenants to sit in her room with her and called her aunt and placed her on speaker phone. When Attorney Yang arrived, he began calling and texting Client 2, but she did not answer or respond, and Attorney Yang eventually left without meeting her.

¶27    Later that day, Attorney Yang and Client 2 had additional text communications regarding her not meeting with him, during which Client 2 indicated that Attorney Yang was "making it a bigger situation than it has to be cuz your not exactly getting your way and I'm not easily lead or persuaded."[16] Client 2 testified that by writing "getting your way" she meant that Attorney Yang "didn't get to come into my room and act out his whole fantasy. He didn't get to have sex with me."[17]

¶28    In approximately May 2022, Client 2 began to believe that Attorney Yang was not zealously representing her because she refused his sexual advances. Thereafter, Client 2 spoke with Attorney Yang by phone and recorded the call. The recording was played at the hearing and transcribed. During this phone call, Client 2 told Attorney Yang, "You

---

[16] This message was sent in response to Attorney Yang expressing his discontent at Client 2 for "blow[ing] [the meeting] off" and saying "if you can't trust me it will make it harder for me to represent you/help you."

[17] Client 2 further testified that this incident was extremely upsetting to her and that afterwards, she spent "three days in my motel room crying because I was trying to figure out how I was going to let him rape me to stay out of prison" and she felt that she "was going to have to figure out how to let him sleep with me and basically be raped because I didn't play nice."

solicit me for sex . . . that whole thing," and Attorney Yang responded, "Ok, so you are going to throw me, you're going to throw me under the bus for that." During the call, Attorney Yang did not deny having solicited Client 2 for sex.[18]

¶29 On approximately June 6, 2022, Client 2 asked Yang to withdraw from representing her and then reported to the SPD that Attorney Yang had solicited her for sex, was harassing her, and had sent her pictures of his penis and a lengthy "smut" message describing what he wanted to do to her in her motel room. Client 2 further told the SPD that Attorney Yang's conduct made her feel like she had to sleep with him.

¶30 On June 6, 2022, Attorney Yang made an oral motion to withdraw from his representation of Client 2, telling the court that there was "a lot of dead wood that would make it difficult to represent her to what she believes is the best of [his] abilities," that there were potential conflicts of interests based on an individual named in the discovery materials, and that there had been an "irreconcilable degradation of communication" with Client 2. Attorney Yang did not tell the court that he had engaged in inappropriate communications with Client 2 or that his conduct was the cause of the breakdown in the attorney-client relationship. At the hearing on the motion to withdraw, the court chastised Client 2, reminded her that Attorney Yang was her third attorney, and warned her that she was "skating on very thin ice" and "running out of opportunity" regarding her eligibility for appointed counsel. The court informed Client 2 that the SPD might not appoint another attorney and that the court would not see it as a great way to convince the court to appoint counsel at county expense. Even after the court chastised Client 2, Attorney Yang did not tell the court about his inappropriate communications that lead to the breakdown in the attorney-client relationship and caused Client 2 to request him to withdraw.

¶31 On November 8, 2022, a representative of the SPD met with Attorney Yang to discuss Client 2's allegations. Following this discussion,

---

[18] Client 2 further expressed how when Attorney Yang was sending her sexually explicit messages he was "saying probably not prison . . . probably jail time or probation" and then after she said "no," he informed her that the State was offering a plea deal with prison time.

Attorney Yang agreed that he would no longer represent female clients for the SPD. Although the SPD no longer appoints Attorney Yang to represent female clients, Attorney Yang testified that he continues to accept female clients through court appointments because courts "have no idea of this [disciplinary proceeding]" or his agreement with the SPD.

Additional Testimony

¶32     While not part of the referee's findings of fact, the court notes the following testimony at the disciplinary hearing, which is relevant to the parties' arguments before this court.

¶33     Attorney Yang testified that "in hindsight" he understands that "what I did was wrong" and that he "take[s] responsibility for it. However, other parts of Attorney Yang's testimony seemed to contradict his expressions of remorse.

¶34     For instance, when describing this period in his life and "why I did [this]," Attorney Yang indicated that he was having a tough time in his marriage, that "it was a very rough time for me, because, you know . . . I just didn't feel anybody giving me affection back for what I did," and that he didn't feel like "a man or a person that was attractive anymore."

¶35     When asked about inviting Client 1 to write him letters with "sexual things," Attorney Yang testified that he "like[s] to write smut, so — that is something—to me, it's an expression, for the most part, free speech, but, yes, I did."[19] When asked about whether he was asking Client 1 to write to him about whether she found him "attractive" and was "getting aroused," he responded: "I would have gladly—I have to admit, part of it was asking her to talk about how I may have attracted to her or how I made her happy, yes. . . . [i]ncluding her sexual arousal, yes." And when asked to clarify whether he was asking Client 1 to write such things for his own "titillation," he responded that "part of my flirting with her was to try and make my client happy." Attorney Yang also indicated that while he now

---

[19] Attorney Yang also testified that he is part of the "kink" community of people interested in BDSM, and indicated that the long narrative sexual fantasy that he sent to Client 2 was a writing he had posted on a public internet forum called "FetLife."

understands such things are not permitted under the Rules of Professional Conduct, it was his belief that "those rules are a little more gray because it doesn't say like, you . . . can't slightly flirt or kind of joke with a client, you know?"

¶36 Similarly, when asked about whether he understood that his Snapchat conversations with Client 2 were inappropriate, he responded: "I do, because unfortunately we live in a time where anything of a sexual nature has a certain tint to it due to the ——I don't want to go into the details of a puritanical thing." Attorney Yang also indicated his belief that the line between appropriate communications with a client and discussing personal sexual interests was "a very thin line[.]" He also stated that in his mind, talking about his sexual interests with a client was similar to an attorney speaking to a client about a shared interest in baseball, but he now understands that he "shouldn't try to walk that line" because "[i]t is taboo." Also, Yang indicated that was "very difficult" for him to not make "off-color joke[s]" and refrain from "say[ing] something dirty about a judge," and attributed this to "this new kind of post-feminist world" where "everything is very sensitive. Everything."

¶37 Along the same lines, Attorney Yang indicated that the rules governing sexual harassment "can be very vague" and stated that had "never seen anyone sit down and have a CLE on offensive personality and what that can entail." Attorney Yang further indicated that as a result of this proceeding, "I also think, okay, going forward how can I as an attorney not offend women in general, or just people in general[.]"

¶38 Attorney Yang's therapist also testified on his behalf, although she did not provide an expert opinion as to what motivated Attorney Yang's misconduct and did not conduct a forensic interview or provide forensic treatment. Instead, she testified that she was treating Attorney Yang for "a mix of anxiety and grief and sadness and shock and fear" as a result of this disciplinary proceeding. The therapist indicated that Attorney Yang expressed a lack of "understanding how to interact with women in this day and age in the professional world" and that he "doesn't know what will get him in trouble or what won't." She elaborated that Attorney Yang expressed "confus[ion] about what the social semantics are" in interacting with women in the workplace "because of the—you know, the MeToo movement[.]" The therapist indicated that she discussed with Attorney Yang the difference between "having a conversation about baseball and a conversation of a sexual nature with a client or somebody in

a professional setting[.]"Attorney Yang confirmed his discussions with his therapist about needing to avoid sexual conversations with his clients despite his "problems with how puritanical things can be" because "that is . . . the professional world we live in" and "[t]hat is what people expect from their attorneys."

Referee's Report

¶39    After setting forth the alleged violations and incorporating the OLR proposed findings of fact, the referee concluded that those facts, together with Attorney Yang's admissions in his answer and testimony, were sufficient to establish all four counts of misconduct, which were "amply demonstrated in this record[.]"

¶40    The referee then addressed the issue of sanctions. The referee concluded that the nature and the extent of the misconduct were serious and indicated that the misconduct "strikes at and undermines the very purpose and nature of the attorney/client relationship: to selflessly strive to serve and protect vulnerable persons enmeshed in a system they neither fully understand nor have the training, background or experience to competently navigate."

¶41    The referee then examined the relevant aggravating and mitigating factors. For aggravating factors, the referee determined that Attorney Yang's misconduct was aggravated by: "selfish motive, *i.e.* seeking his personal sexual gratification; multiple offenses; vulnerable victims; and his ten years of experience in the practice of law." The referee concluded that mitigating factors included: "no previous discipline; cooperation with the investigation; admission to the misconduct; personal or emotional problems; and remorse." However, the referee indicated, multiple times, that evidence as to whether Attorney Yang acknowledged the wrongful nature of his conduct was "conflicted." In the referee's view, "whether the respondent truly acknowledges the wrongfulness of his conduct remains an open question, not sufficiently proven to be either aggravating or mitigating the sanction otherwise warranted in this case."

¶42    As to the ultimate sanction, the referee concluded that "the record is insufficient to support the OLR's argument for revocation of the respondent's law license." The referee based this conclusion on his view that in order to revoke Attorney Yang's law license, the OLR needed to prove by "clear, satisfactory and convincing evidence that the respondent

has a propensity to engage in the type of behavior with female clients he demonstrated in his interactions with Client 1 and Client 2." The referee indicated that such proof of "propensity" was required in order to conclude that "the ultimate misconduct sanction is . . . compelled by the need to protect the public, courts and the legal system from the respondent's repetition of the misconduct."

¶43   Thus, the referee recommend that the court impose a one-year license suspension on Attorney Yang and condition his readmission on continuing to attend counselling during his suspension period and requiring him to submit to a forensic psychological examination to determine his "likelihood of [re-offense], taking into account [his] lifestyle and interests."

## Analysis

¶44   We will affirm the referee's findings of fact unless they are clearly erroneous. *In re Disciplinary Proceedings Against Alfredson*, 2019 WI 17, ¶27, 385 Wis. 2d 565, 923 N.W.2d 869. We review conclusions of law de novo. *Id.* The court may impose whatever sanction it deems appropriate, regardless of the referee's recommendation. *Id.*

¶45   As noted, the referee determined that Attorney Yang's admissions in his answer to the complaint, as well as the testimony at the disciplinary hearing established all four counts of misconduct. We agree that the record demonstrates that the OLR proved that Attorney Yang violated SCR 20:8.4(i) (sexual harassment) and SCR 20:8.4(g) read together with SCR 40.15 (offensive personality) with respect to his interactions with Client 1 and Client 2. Attorney Yang concedes the violations in his briefing to this court.

¶46   Before addressing the appropriate sanction, we note that Attorney Yang argues that the referee's determination that he had inappropriate physical contact with Client 1 was clearly erroneous. Attorney Yang contends that the evidence established only that he "hugged" Client 1 and "that there was incidental contact at small counsel's table." However, Client 1 testified that Attorney Yang "would . . . try to rub my shoulder, try to act supportive but in an inappropriate way." Client 1 further indicated that she did not want Attorney Yang to hug her or try rub her shoulders and when he did "I was very uncomfortable and kind of like, afraid to, like dismiss him." She characterized the physical contact or

15

attempt at physical contact as "not appropriate" when coupled with his other conduct, such as calling her "sweetie pie." Yang denied trying to rub Client 1's shoulders or back. Yang further testified that he hugged Client 1 because she "was literally crying" and he "did what I think most people would do in [that] situation[.]"

¶47 While the referee did not make any express credibility determinations on this point, the referee accepted the OLR's proposed fact that "[Attorney] Yang tried to rub [Client 1's] shoulders and back and repeatedly tried to hug her or cause her to hug him." Given that the referee adopted the OLR's proposed finding, we conclude that the referee implicitly found Client 1's testimony on this point credible. *See Jacobson v. American Tool Companies, Inc*., 222 Wis. 2d 384, 390, 588 N.W.2d 67 (Ct. App. 1998) ("If a circuit court does not expressly make a finding about the credibility of a witness, we assume it made implicit findings on a witness' credibility when analyzing the evidence.") With that, we determine that the record supports the determination that Attorney Yang hugged Client 1 on at least one occasion and attempted to rub her back under circumstances where she did not want physical contact. *See State v. Arias*, 2008 WI 84, ¶12, 311 Wis. 2d 358, 752 N.W.2d 748 ("A finding is clearly erroneous if 'it is against the great weight and clear preponderance of the evidence.'") (citation omitted). We note, however, that given the nature, seriousness, and pervasiveness of the other instances of misconduct catalogued above, our conclusion as to what sanction is appropriate in this matter does not hinge on whether Attorney Yang attempted to give Client 1 a backrub.

¶48 The only other factual dispute before us is the parties' disagreement over whether Attorney Yang adequately acknowledged the wrongfulness of his misconduct. We will discuss that below when addressing the appropriate sanction in this case.

¶49 In determining the appropriate sanction for Attorney Yang's misconduct, we consider "[t]he seriousness, nature, and extent of the misconduct; the level of discipline needed to protect the public; the need to impress upon the attorney the seriousness of the misconduct; and the need to deter other attorneys from similar misconduct." *In re Disciplinary Proceedings Against DeLadurantey*, 2023 WI 17, ¶52, 406 Wis. 2d 62, 985 N.W.2d 788. We also consider the relevant ABA Standards for Imposing

Lawyer Sanctions (ABA Standards), including appropriate aggravating[20] and mitigating[21] factors.

¶50     The OLR contends that Attorney Yang's misconduct is serious enough to warrant revocation. The OLR stresses that this case involves repeated instances of a court-appointed public defender taking advantage of his clients for his own personal interests and repeated acts of sexual harassment that not only victimized his two clients, but damaged the integrity of the justice system as a whole. In this respect, the OLR compares Attorney Yang's misconduct to that of the assistant district attorney whose license we revoked in *In re Disciplinary Proceedings Against Steffen*, 2025 WI 31, 416 Wis. 2d 742, 22 N.W.3d 946.

¶51     In contrast, while Attorney Yang admits that his misconduct was "serious," he attempts to minimize the nature and extent of his misconduct and its effect on the judicial system. For instance, he asserts that the only thing at issue is "inappropriate *verbal* behavior." He stresses that this case involves only "two clients" and a "brief period of misconduct," and does not involve "widespread" distrust or damage to the judicial system. Attorney Yang emphasizes repeatedly that his misconduct did not involve criminal acts, argues that he was acting only as a "private bar attorney" and not a "government lawyer," and asserts that while his misconduct was "wildly inappropriate and unethical" it "was not an abuse of public trust." Attorney Yang further contends that the OLR's request for revocation is out of step with our disciplinary case law, "plac[es] undue weight on the subjective feelings of [his] clients," and is based on a framing of the facts "in an incredibly graphic and salacious manner." Attorney Yang characterizes the OLR's request for revocation as an attempt to "punish

---

[20] Aggravating factors include: a dishonest or selfish motive, a pattern of misconduct, multiple offenses, refusal to acknowledge wrongful conduct, vulnerability of the victims, substantial experience practicing law, and illegal conduct. *See* ABA Standards 9.22(b)-(k).

[21] Mitigating factors include: the absence of prior discipline, personal or emotional problems, cooperating with disciplinary authorities, character or reputation, alcoholism, delay in the disciplinary proceeding, the fact that the respondent has suffered other penalties or sanctions for the misconduct, and expression of remorse. *See* ABA Standards 9.32(a)-(l).

Attorney Yang for both his admitted and proven misconduct, and for his lawful personal interests." Attorney Yang further argues that while worthy of a short suspension, his misconduct is more akin to cases in which this court imposed a public reprimand for instances of sexual harassment. He contends that "[t]o impose a penalty significantly harsher than what has been previously imposed for words, without notice, would be unreasonable and unfair."

¶52    We disagree with Yang's arguments and his characterization of his misconduct. The misconduct in this case is beyond the pale. It does not involve an isolated act of sexual harassment or an off-color joke made to a colleague. Instead, the misconduct, as detailed above, reveals a pervasive course of conduct as to each client that the referee concluded was "intended to result in sexual activities with them during the course of representation."

¶53    To briefly summarize, Attorney Yang engaged in unwanted physical contact (giving hugs and an attempted backrub), sexually suggestive innuendos and requests for physical sexual contact, flirtatious verbal communications, perceived invitations and requests for sexual contact as a condition of continued legal services, sexually explicit written communications (including a graphic point-of-view sexual fantasy), and sent unsolicited pictures of his genitalia to a client. Attorney Yang admitted in his testimony that these interactions were for his own "titillation" and "satisfaction."

¶54    The harassment and solicitation was so severe and pervasive that Client 1 testified that she stipulated to the revocation of her probation and spent over a year in prison because she was afraid of and disgusted by Attorney Yang. She also asked a sheriff's deputy at one of her hearings to protect her from Attorney Yang in case he tried to touch her again. Client 2 was scared to meet with Attorney Yang in person, locked herself in a motel room for three days contemplating whether she would have to let Attorney Yang rape her to allow her case to proceed, reported Attorney Yang's misconduct to the SPD, and was chastised by a court (who was not aware of any of the underlying misconduct) after she requested that Attorney Yang withdraw from representation. The SPD eventually barred Attorney Yang from representing female clients as a result of Client 2's allegations. While Attorney Yang complains that the OLR has framed his conduct in an "incredibly graphic and salacious manner" that is because there is no other way to accurately characterize what he wrote and said to his clients.

¶55 Engaging in such conduct with a client would be grossly unacceptable under any circumstances, but its severity is worse here because Attorney Yang was appointed to represent Client 1 (who was incarcerated during his representation) and Client 2 in criminal cases in which they faced a loss of their liberty. Attorney Yang's protestations that his situation is different than the attorney in *Steffen* because he was a "private bar attorney" and not an employee of the state misses the point entirely. From the perspective of his clients, Attorney Yang was a government-appointed attorney charged with zealously representing their interests and was the only thing standing between them and a prison cell. Attorney Yang preyed upon the vulnerable nature of his indigent clients and abused his position of trust and authority in an effort to satisfy his own prurient personal interests. Particularly noteworthy is that Attorney Yang's misconduct caused Client 1 to abandon any defenses she might have to a probation revocation proceeding and sacrifice her liberty in order to avoid his sexual advances and that Client 2 believed she needed to have sexual relations with Attorney Yang to obtain zealous representation.

¶56 The relevant aggravating factors include a dishonest or selfish motive, a pattern of misconduct, multiple offenses, the vulnerability of the victims, and substantial experience practicing law. While we recognize that some mitigating factors are present—namely, the absence of prior discipline and cooperation with the OLR—those do not outweigh the seriousness and nature of the misconduct, the need to protect the public, the need to impress upon Attorney Yang the seriousness of the misconduct, and the need to deter other attorneys from similar misconduct.

¶57 Attorney Yang argues that other mitigating factors are present, such as the personal and emotional problems he was experiencing in his marriage, other collateral consequences, and his expressions of remorse. We disagree.

¶58 As to Attorney Yang's expressed personal and emotional problems in his marriage, which he characterized as not feeling like "a man or a person that was attractive anymore," we note that Attorney Yang did not present any medical evidence that he was suffering from clinical depression or any other recognized emotional or personality disorder when he committed the misconduct. Regardless, Attorney Yang's personal feelings of loneliness and lack of self-worth in no way justify or in any way

lessen the severity of his pervasive sexual harassment of his clients. They certainly do not provide any basis for a reduced sanction in this case.[22]

¶59    Additionally, Attorney Yang argues that he has suffered "collateral consequences" in the way of a broken marriage, "negative publicity" when he ran for the State Bar Board of Governors, and "lost friends on social media." These are not the type of "other penalties or sanctions" contemplated by ABA Standard 9.3(k). This mitigating factor generally applies "[w]hen a lawyer has been assessed other penalties for the misconduct, ranging from fines to criminal sentences[.]"[23] "Not every consequence of misconduct that a lawyer faces is considered a penalty or other sanction under this subsection, nor is a penalty or sanction found to constitute mitigation when the impact of the lawyer has been minimal."[24]

¶60    Attorney Yang asserts that his testimony establishes that "[h]e has shown remorse and understands what he did was wrong." However, while acknowledging that Attorney Yang testified to this effect, we agree with the OLR that Attorney Yang's perfunctory statements of contrition cannot be squared with his other testimony and the arguments in his brief, in which he continually minimizes the severity of his misconduct, attempts to blame his victims, and expresses a belief that he cannot continue his behavior due to what he appears to believe are unreasonable social mores.

¶61    Attorney Yang testified that he understands that he can no longer flirt with his clients, send them sexually explicit messages, or attempt to share his sexual interests, not because he understands that doing so fundamentally violates his duties as an attorney, but because in his mind,

---

[22] The ABA Annotated Standards acknowledge that "personal and emotional problems" generally (though not always) overlap with other mitigating factors such as mental or physical disability or chemical dependency. *See* Annotated Standards for Imposing Lawyer Sanctions, American Bar Association, at 495 (2d ed. 2019) ["Annotated Standards"]. Further, "even significant personal or emotional problems may not justify a reduction in sanction when weighed against the severity of the misconduct." *Id.* at 501.

[23] *Id.* at 533.

[24] *Id.* at 535.

such things are "taboo" and not permitted by "this new kind of post-feminist world" where "everything is very sensitive. Everything." In his briefing to this court, Attorney Yang continues to blame his misconduct on his lack of understanding of "social semantics," such as not comprehending that there is a distinct difference between "talk[ing] about baseball with a client" and sending a client pictures of his genitalia or graphic sexual writings. When attempting to explain his unwanted hug to Client 1, Attorney Yang tells us that she "had a history of mental health problems" and he was merely trying to "comfort her" when she was crying. In his answer to the complaint, Attorney Yang attempted to justify his sexually charged comments to Client 1 as being "in the context of trying to cheer his client up after she reported she was depressed and sad . . . ." He testified that he thought his sexual innuendos would help Client 1 get out of her depressed state because "she would be happy that I was flirting with her[.]" Attorney Yang argues in his brief that Client 2 "appeared to consent" to his repeated sexual messages and that Client 2 responded "in an apparently positive manner." In short, Attorney Yang's perfunctory statements of contrition mean very little because his testimony at the disciplinary hearing and arguments to this court indicate that he does not really comprehend why what he did was wrong.

¶62    ABA Standard 7.1 indicates that revocation[25] "is generally appropriate when a lawyer knowingly engages in conduct that is a violation of a duty owed as a professional with the intent to obtain a benefit for [himself] . . . and causes serious or potentially serious injury to a client, the public, or the legal system." That is precisely what occurred here.

¶63    As the referee remarked, Attorney Yang's misconduct was a "serious breach" of the fiduciary duties he owed his clients[26] and

---

[25] The ABA standards use the phrase "disbarment," which, in Wisconsin, is equivalent to "revocation."

[26] *See* SCR 20:1.8(j), cmt. 17:

The relationship between lawyer and client is a fiduciary one in which the lawyer occupies the highest position of trust and confidence. The relationship is almost always unequal; thus, a sexual relationship between lawyer and client can involve unfair exploitation of the lawyer's fiduciary role, in violation of the

"defeat[ed] the very purpose of legal representation" by "turn[ing] the relationship on its head, effectively requiring the client to serve the attorney's interest instead." Two examples illustrate this. First, while engaging in a sexually charged conversation with Client 1 when she was incarcerated, Client 1 told Attorney Yang she wanted him to get her out of jail as quickly as possible; Attorney Yang responded, "what do I get?" Second, Attorney Yang's sexual communications and overtures towards Client 2 resulted in her ultimately asking him to withdraw as her counsel. When the court expressed ire at Client 2 and suggested that she may not get another attorney, Attorney Yang stood mute and did not defend his client or clarify that her request for withdrawal was due to his inappropriate behavior. Both clients indicated that Attorney Yang's inappropriate and overtly sexual communications caused them to believe that he was seeking a sexual relationship in order to keep representing them. Attorney Yang's misconduct and its effect on his clients and the judicial system is a far cry from just "words" as he contends in his brief.

¶64     In light of the above, we conclude that revocation of Attorney Yang's license to practice law is the only appropriate sanction in this case given "[t]he seriousness, nature, and extent of the misconduct; the level of discipline needed to protect the public; the need to impress upon the attorney the seriousness of the misconduct; and the need to deter other attorneys from similar misconduct." *In re DeLadurantey*, 406 Wis. 2d 62, ¶52.

¶65     We note that neither our existing disciplinary jurisprudence nor the ABA Standards require proof of "propensity" to commit further acts of misconduct in order to justify revocation where it is otherwise appropriate. To the contrary, this court routinely revokes the licenses of attorneys for large scale trust account violations/theft of client funds without making any form of "propensity" determination, and even without prior discipline. *See, e.g., In re Disciplinary Proceedings Against Conmey*, 2005 WI 166, 286 Wis. 2d 514, 706 N.W.2d 633 (revocation imposed for converting large amount of estate funds in two matters despite no prior disciplinary history). Nor did the court make any "propensity" finding in *Steffen*, involving an attorney who already served a prison sentence for his misconduct. That Attorney Yang's continued practice of law poses a danger to the public and the administration of justice is self-evident by the nature

---

lawyer's basic ethical obligation not to use the trust of the client to the client's disadvantage . . . .

of the acts in which he engaged. It is also evidenced by the fact that Attorney Yang required a therapist and a disciplinary proceeding to understand that attorneys cannot send clients pictures of their genitals, share graphic sexual fantasies with them, request sexual writings from them, or engage in multiple sexually charged conversations indicating or implying a desire for a sexual relationship with them.

¶66     We further reject Attorney Yang's contention that revocation of his license would be out-of-step with our prior jurisprudence and that doing so would be "unreasonable" or "unfair" and "without notice." As this court has frequently stated, "since no two disciplinary cases are precisely the same, there is no standard sanction for any particular misconduct*." In re Disciplinary Proceedings Against Luening*, 2023 WI 76, ¶46, 409 Wis. 2d 493, 998 N.W.2d 493. We have recently emphasized, however, that "sexual misconduct by attorneys, whether with clients or non-clients, is not taken lightly." *In re Disciplinary Proceedings Against Ritland*, 2021 WI 36, ¶39, 396 Wis. 2d 509, 957 N.W.2d 540. And we have given members of the bar notice that "we are applying increasing scrutiny to attorneys' sexual misconduct." *In re DeLadurantey*, 406 Wis. 2d 62, ¶53; *see also In re Ritland*, 396 Wis. 2d 509, ¶37 ("[A]ttorneys who engage in sexual misconduct do so at their professional peril.").

¶67     As the OLR rightly points out, attorneys in Wisconsin have been on notice since 1973 that instances of repeated sexual harassment may lead to significant sanctions, including an indefinite suspension. *See In re Disciplinary Proceedings Against Heilprin*, 59 Wis. 2d 312, 207 N.W.2d 878 (1973). The sexual harassment in *Heilprin* involved multiple instances of the respondent "talk[ing] obscenely" with clients in person and on the phone, "ma[king] indecent sexual proposals" and "sexual advances," and "indecently expos[ing] himself" to clients. *Id*. at 315. Despite the fact that the respondent claimed his misconduct was the result of a personality disorder for which he was receiving treatment, we indefinitely suspended his license, indicating that his "personality disorder does not excuse his misconduct. Conduct of th[is] type . . . cannot be condoned, whatever the cause. The public must not be exposed to this type of action from members of the legal profession." *Id.* at 322. While it is true, as Attorney Yang points out, that *Heilprin* was decided under a prior version of our Rules of Professional Misconduct and that the current rules do not contain an "indefinite suspension" as a sanction, this again misses the point. *Heilprin* demonstrates that this court has long recognized that pervasive sexual harassment of clients is unacceptable and will result in significant

disciplinary sanctions to protect the public. Indeed, the court later revoked that attorney's license for engaging in similar behavior in a subsequent disciplinary proceeding involving two clients to whom he directed sexually explicit comments and questions during office conferences and phone calls, thereby "plac[ing] his personal, prurient interests above the interests of those seeking his counsel in legal matters[.]" *In re Disciplinary Proceedings Against Heilprin*, 168 Wis. 2d 1, 3, 482 N.W.2d 908 (1992). We indicated: "Certainly, the public should not be subjected to such offensive behavior conducted under the authority of a license to practice law." *Id.*

¶68     Likewise, in *Ritland*, we discussed at length the harm caused to victims of attorney sexual misconduct and its impact on the judicial system and indicated that older cases in which attorneys received a minimal sanction for acts of sexual harassment were not consistent with our current understanding of the seriousness of such misconduct—particularly when it affects the integrity of the justice system. We reiterated:

> We have traveled a far way from tolerance of sexual misconduct in the workplace and in our profession. We recognize the psychological damage that can be inflicted on the victims of sexual abuse, who silently suffer and do not complain because they feel powerless to do so. The sexual abuse of a client is unacceptable in any profession and in any business setting, and cannot be tolerated in our profession, which holds as sacred the dignity of the individual.

*In re Ritland*, 396 Wis. 2d 509, ¶37 (quoting *In re Disciplinary Proceedings Against Hanes*, 2020 WI 89, ¶31, 394 Wis. 2d 585, 951 N.W.2d 426). And we further recognized that our recent cases had "reflected and reinforced" these principles by imposing "lengthy suspensions" on "attorneys who engaged in sexual misconduct with either clients or non-clients." *Id.*, ¶38 (collecting cases).

¶69     And just last term, this court revoked the license of an assistant district attorney as a result of sexual misconduct involving one individual he was actively prosecuting and another who came to him for advice for avoiding criminal charges. *In re Steffen*, 416 Wis. 2d 742. While the misconduct in that case involved criminal acts of surreptitiously recording sexual encounters with the two victims without their consent, we emphasized that the misconduct involved the respondent "sexually exploit[ing] his victims for his own selfish interests" and doing so "while

holding a position of public trust with the ability to exercise the prosecutorial powers of the state over his victims." *Id.*, ¶51.

¶70 Attorney Yang's attempts to distinguish *Steffen* by noting that he was not acting as a prosecutor, did not commit criminal acts, and did not have physical sexual contact with his clients are unavailing and miss the point. The sanction in *Steffen* was driven by the undisputed facts in that case demonstrating that the respondent had "abuse[d] his position of power and authority" over his victims and his actions "call[ed] into question the very foundation of the judicial system as a neutral and objective dispenser of justice." *Id.*, ¶¶50-51. Here, Attorney Yang's pervasive sexual harassment of the clients the SPD appointed him to represent lead them to believe that having a sexual relationship with him was a condition-precedent to obtaining zealous advocacy. Such beliefs undermine the public's trust in the criminal justice system and the state's constitutional obligation to provide indigent individuals accused of crimes with competent representation. In this respect, this case is a mirror image of *Steffen*.

¶71 To the extent that Attorney Yang contends that no prior case involving sexual harassment without physical sexual contact has resulted in revocation, that is because we cannot locate a prior instance of a such obvious, odious, and pervasive sexual harassment by a criminal defense attorney involving his clients as this. That both of Attorney Yang's clients rebuffed his sexual advances and the relationships did not result in physical sexual contact in no way diminishes the seriousness of Attorney Yang's misconduct. Nor do we accept Attorney Yang's assertion that ordering his license to be revoked would amount to punishment for his "lawful personal interests." This statement ignores that the fundamental problem in this case is that Attorney Yang admittedly failed to keep his personal sexual interests and desires separate from his fiduciary duties to Client 1 and Client 2 while representing them. Having concluded that revocation is the appropriate sanction, we do not address the conditions that the referee recommended that Attorney Yang be subject to as part of the referee's proposed suspension.

¶72 We turn now to the issue of costs. We follow our general policy under SCR 22.24(1m) of imposing the full costs of this proceeding on Attorney Yang, which total $23,229.07, including referee expenses, as of February 19, 2026. There are no extraordinary circumstances present that would justify departing from the court's standard practice of imposing full

costs on the respondent attorney. *See In re Disciplinary Proceedings Against Lister*, 2015 WI 8, ¶47, 360 Wis. 2d 330, 858 N.W.2d 687.

¶73    Attorney Yang contends that the OLR "over-litigated this matter" and argues that the court should impose only half of the reported costs on him. However, that assertion is based almost entirely on the OLR's decision to appeal the referee's report and recommendation and Attorney Yang's contention that revocation is not warranted in this case. As we have discussed above, revocation is indeed warranted in this matter. We also note that Attorney Yang did not file any objection to the OLR's initial statement of costs, including its claimed attorney fees, which Attorney Yang now contends is unreasonable. Pursuant to SCR 22.24(2), Attorney Yang was required to submit any objection to the OLR's initial statement of costs "within 21 days of the statement of costs." Attorney Yang did not do so and instead raised concerns with the OLR's statement of costs for the first time in his appellate brief. Thus, to the extent that Attorney Yang contests any of the OLR's pre-appellate costs, he has forfeited the objection.

¶74    Following briefing, the OLR filed a supplemental statement of costs, to which Attorney Yang timely objected. In addition to his general "over-litigation" objection, Attorney Yang argues that the OLR's hourly rate of $125 per hour for the time its attorneys spent working on this matter is unreasonable. Attorney Yang contends that a rate of $125 per hour for a "salaried litigation attorney" is unreasonable both because the OLR "provided no backup documentation to show how this rate was calculated" and because it is higher than the SPD rate for private bar counsel ($100 per hour) and the referee's hourly rate in this matter ($75.51 per hour). Attorney Yang requests that if the court assesses full costs, it should do so only at the hourly referee rate and charge him $10,035.28.

¶75    The OLR responds that its $125 hourly rate was approved by the court's Board of Administrative Oversight (BAO) in 2024, which considered the average rate of private practitioners ($251 per hour) and the rate charged by the Wisconsin Department of Justice for civil litigation attorney time ($190 per hour). The OLR indicates that Attorney Yang has not contested that its hourly rate of $125 was approved by the BAO in 2024 and further notes that Attorney Yang has not objected to any single line-item of reported cost or hours billed as unreasonable.

¶76    Attorney Yang has not cited any prior case in which we have found that the $125 rate billed by the OLR's attorneys in disciplinary

matters was unreasonable. Nor has he cited any prior case in which we have held that the OLR's hourly rate for disciplinary matters is limited to the hourly rate charged by the referee. We further take judicial notice that according to a publication by the Wisconsin State Bar, the average hourly rate for Wisconsin attorneys in 2002 was $248, and $251 per hour when adjusted for the cost of living.[27]

¶77    In short, we find no basis for Attorney Yang's argument that the OLR "over-litigated" this matter or that the fees charged by its counsel are unreasonable. Attorney Yang has not identified any other extraordinary circumstances warranting a reduction in costs.

¶78    IT IS ORDERED that the license of Attorney Michael Seung-Hyock Yang is revoked, effective the date of this order.

¶79    IT IS FURTHER ORDERED that within 60 days of the date of this order, Attorney Michael Seung-Hyock Yang shall pay to the Office of Lawyer Regulation the full costs of this proceeding, which are $23,229.07, as of February 19, 2026.

¶80    IT IS FURTHER ORDERED that Attorney Michael Seung-Hyock Yang shall comply with the provisions of SCR 22.26 concerning the duties of a person whose license to practice law in Wisconsin has been revoked.

¶81    IT IS FURTHER ORDERED that compliance with all conditions of this order is required for reinstatement. *See* SCR 22.28(3).

---

[27] State Bar of Wisconsin, 95 *Wisconsin Lawyer* 3 (Mar. 2022).

IN RE DISCIPLINARY PROCEEDINGS AGAINST
ATTORNEY MICHAEL SEUNG-HYOCK YANG
JUSTICE ZIEGLER, concurring

ANNETTE KINGSLAND ZIEGLER, J., with whom JILL J. KAROFSKY, C.J., REBECCA GRASSL BRADLEY, BRIAN K. HAGEDORN, and JANET C. PROTASIEWICZ, JJ., join, concurring.

¶82    I concur in the court's order revoking Attorney Yang's license to practice law in Wisconsin. I write separately to point out that in Wisconsin the "revocation" of an attorney's law license is not truly revocation because the attorney may petition for reinstatement after a period of five years. *See* SCR 22.29(2). I believe that when it comes to lawyer discipline, courts should say what they mean and mean what they say. We should not be creating false perceptions to both the public and to the lawyer seeking to practice law again. *See In re Disciplinary Proceedings Against Moodie*, 2020 WI 39, 391 Wis. 2d 196, 942 N.W.2d 302 (Ziegler, J., dissenting). And, as I stated in my dissent to this court's order denying Rule Petition 19-10, *In the Matter of Amending Supreme Court Rules Pertaining to Permanent Revocation of a License to Practice Law in Attorney Disciplinary Proceedings*, I believe there may be rare and unusual cases that would warrant the permanent revocation of an attorney's license to practice law. *See* S. Ct. Order 19-10 (issued Dec. 18, 2019) (Ziegler, J., dissenting).

¶83    For the foregoing reason, I concur.